**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 7/22/21

1                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW HAMPSHIRE
2

3    * * * * * * * * * * * * * * * * *
                                     *
4    NATASHA DELIMA,                 *
                                     *
5                      Plaintiff.    *  No. 1:19-cv-00978-JL
                                     *  January 21, 2021
6                                    *  2:14 p.m.
              v.                     *
7                                    *
                                     *
8    GOOGLE INC., ET AL,             *
                                     *
9                      Defendants.   *
                                     *
10   * * * * * * * * * * * * * * * * *

11                  TRANSCRIPT OF MOTION HEARING
12                  HELD VIA VIDEOCONFERENCE
            BEFORE THE HONORABLE JOSEPH N. LAPLANTE
13

14
     APPEARANCES:
15

16   For the Plaintiff:     Natasha DeLima, pro se

17

18   For the Defendants:    Jonathan Eck, Esq.
                            Orr & Reno
19
                            Ryan Thomas Mrazik, Esq.
20                          Perkins Coie LLP

21

22
     Court Reporter:        Brenda K. Hancock, RMR, CRR
23                          Official Court Reporter
                            United States District Court
24                          55 Pleasant Street
                            Concord, NH 03301
25                          (603) 225-1454

1                        P R O C E E D I N G S

2              THE CLERK:  The Court has before it for consideration

3        today a motion hearing in civil case number 19-cv-978-JL,

4        Natasha DeLima versus Google, et al.

5              THE COURT:  All right.  Good afternoon, Ms. DeLima.

6              MS. DELIMA:  Good afternoon, Judge.

7              THE COURT:  And good afternoon, Counsel.  I assume

8        Jadean has introduced you to Nick and Garrett.  Sorry it took

9        me so long to get on.  I've been having a lot of trouble the

10       last three or four days with my camera, but I finally got it

11       going by doing the old unplug and plug it back in, the camera.

12             So, we're here on a motion to dismiss, motion for

13       judgment on the pleadings, really, actually, which is really

14       the same thing.

15             And I just want to remind you, Ms. DeLima, I'm very

16       happy to listen to your arguments today.  I've read your

17       material very carefully.  I can't give you legal advice, but

18       you certainly are entitled to proceed *pro se* and represent

19       yourself.  There's no problem with that at all, but I do have

20       to apply the rules of court to you.  Today there's one type of

21       rules that apply and there's one type of rules that don't.  The

22       *Rules of Evidence* don't apply in this hearing, so you don't

23       have to worry about that at all.  The *Rules of Evidence* don't

24       apply in a Rule 12(b) hearing.  I take your pleadings as true,

25       period.  That's the standard.

1          But the *Rules of Civil Procedure*, which are the other

2     kind of rules that we have to use in court do apply, and that

3     just means that they set forth the burden.  The burden here

4     today, the burden is on the defendant, not you.  The burden is

5     on the other side to demonstrate that your pleadings, even if

6     they're true, don't really amount to a legal claim, and that's

7     their burden.  So, it's their motion.  I'm going to listen to

8     them first.  I'm going to let Mr. Eck and Mr. Mrazik, Mrazik --

9     how do I pronounce your name correctly?

10          MR. MRAZIK:  Mrazik.  Right in the middle.

11          THE COURT:  I'm going to let them make their

12     arguments, and then I'm going to listen to you, and I'm happy

13     to let you tell me anything you want to tell me.  Okay?

14          MS. DELIMA:  Thank you.

15          THE COURT:  Okay.  Who's going to handle the argument?

16          MR. ECK:  Mr. Mrazik will, your Honor.

17          THE COURT:  All right, Mr. Mrazik, go ahead.  I'll let

18     you proceed as you wish.

19          MR. MRAZIK:  Thank you, your Honor.  We're here today

20     on our motion to dismiss Ms. DeLima's most recent complaint

21     against Google and YouTube and Twitter.  As we set out in our

22     papers, our point of view on this is that it is a continuation

23     of litigation that Ms. DeLima previously brought against the

24     same clients with the same operative facts and that we

25     relitigated through this District Court up through to the First

1   Circuit and then which was denied certiorari by the Supreme

2   Court.

3   　　　　THE COURT:  But doesn't it have some new facts,

4   though?  It seems to allege new facts right in the complaint,

5   not just in the objection, as you point out, but there seem to

6   be facts especially regarding YouTube that occurred after all

7   that litigation.  No?

8   　　　　MR. MRAZIK:  I think you're right, your Honor.  I

9   looked at the complaint again last night and again this

10  morning, and I think there are two specific allegations in the

11  complaint that arguably postdate the initial litigation.  There

12  is one against YouTube in 2018 and says that Google didn't

13  appropriately add followers to her accounts from 2018 through

14  the present.  I think that's the first specific allegation.

15  That one is as to YouTube, and it says 2018 through the

16  present.  So, I think it's arguable that that one occurred

17  after the initial complaint.

18  　　　　THE COURT:  Okay.

19  　　　　MR. MRAZIK:  It still ties in together, as Ms. DeLima

20  said in her surreply, and I do think that it bears noting, too,

21  that she said that if she had won in 2017 we wouldn't be here

22  again today.  As I think about those complaints, though, in

23  2018 and 2019 and supposedly 2020 against YouTube, the idea

24  that YouTube didn't appropriately add followers to her account

25  is not an actionable claim in any event.  I think it's not a

1    viable -- I don't know what the cause of action would be and

2    that it would be viable, in any event, and then I think it

3    would also be subject CDA immunity swell.  It is within

4    YouTube's discretion to decide how it runs its platform, who it

5    has accounts to, who gets to follow who, and the conduct would

6    be immunized in any event.

7         So, I do think you're right that there is one fact in

8    the initial complaint against YouTube that arguably goes later

9    than the initial complaint was, but I think it would not be

10   viable and would fail, in any event.

11        I think there's a second one.  Ms. DeLima alleges that

12   she was locked out of her Twitter account in 2019 for tweets

13   regarding Jim Acosta, and, as I understand it, the allegation

14   in the complaint, she says that she tweeted something, was

15   asked by Twitter to remove it and was temporarily suspended

16   from her account unless and until she did.  I also, as the same

17   as the claims against Google and YouTube on that one, I do not

18   think that's a viable claim.  A temporary suspension;

19   presumably she regained access shortly thereafter.  I don't

20   know what the cause of action arising from that would be, and,

21   again, it would be subject to CDA immunity.  So, I do think

22   it's a fair reading of the initial complaint.  I think that

23   everything else that is in the objection and the surreply, I'm

24   a little unclear on dates in there, but in the initial

25   complaint itself I do think there are those two facts, in

1   particular, that you could arguably say occurred after the

2   initial litigation.  If there are others that your Honor picked

3   up on, I'm happy to address those as well, but those were the

4   two that I noticed on reading the complaint again.

5        THE COURT:  Well, I think for my purposes you've

6   covered it, actually, in a very, I want to say, candid way,

7   which I appreciate.  Yeah, for my purposes I think you've

8   covered it.  I think it prohibits what you've noted.  I think,

9   you may differ, I think that prohibits an outright dismissal of

10  everything on *res judicata* grounds, but, as you point out, you

11  don't just make *res judicata* arguments, you're making arguments

12  about the viability of the claims as a matter of substance,

13  right?

14       MR. MRAZIK:  That's correct, your Honor, and I think

15  we said that in our reply.  To the extent that the Court

16  determines that there are claims that are not tied into the

17  same nucleus of operative facts and occurred after the prior

18  litigation was concluded and, therefore, you know, may not fall

19  under the *res judicata*, I think they fail on their viability or

20  because of CDA immunity.

21       THE COURT:  Okay.  All right.

22       MR. MRAZIK:  I'm happy to walk through the additional

23  claims or make a presentation or answer additional questions.

24  Otherwise, I'm not inclined to make a long presentation of our

25  papers.  You seem very familiar with them, and I'm happy to

1   give you more detail on any of the arguments that you'd like,

2   but otherwise I think our papers covered everything, and I'm

3   happy to answer specific questions, or, if you would prefer a

4   presentation, I'm happy to do that as well.

5        THE COURT:  It's not that.  I think what I'd probably

6   rather do is listen to Ms. DeLima and then let you respond to

7   her.

8        MR. MRAZIK:  Understood.

9        THE COURT:  She'll probably make some very specific

10  arguments.  Let me ask this very sort of pedestrian question.

11  Has Twitter been served, or are you accepting service for

12  Twitter?  What's the situation with Twitter's service of

13  process?

14       MR. MRAZIK:  We've not aware that they've ever been

15  served, but we were, obviously, aware of the lawsuit and

16  decided to appear and defend regardless, your Honor.  We didn't

17  see any purpose in delaying service or, particularly, I know in

18  *pro se* cases it's favored that, if you are aware of the case,

19  that you appear and defend.  So, we are appearing and doing

20  that.

21       THE COURT:  Let me ask you this question, then:  On

22  Ms. DeLima's breach of contract claim, is it your position that

23  there's just no contract, or if there is a contract between the

24  parties, what is it?

25       MR. MRAZIK:  I'm not sure there's a contract that

1  would support a right to payment claim or unpaid earnings or

2  wages as it was phrased in the prior lawsuit.  Obviously, in

3  connection with our alternate motion to transfer we did submit

4  our terms of service, which is a contract between us and our

5  account holders, including Ms. DeLima, that has a venue

6  provision.

7       Otherwise, I looked again at the breach of contract

8  language that was raised in the surreply, and, as I understand

9  it, I still can't identify what a specific provision in a

10 contract would be that would support a right to payment or some

11 sort of payment of revenue, which, as I understand it, is what

12 she's seeking.  There are contracts between us and Ms. DeLima,

13 and I think we have referred to them, but I think we would need

14 to find a specific provision that would entitle her to some

15 payment that would be enforceable, and I don't see that in the

16 pleadings or in the opposition papers or in the surreply.

17      So, I can't say there's not a contract, because,

18 obviously, we do have one.  I don't understand what the

19 contractual provision or language or term might be that would

20 support a claim of revenue payment, and, as I understand Ms.

21 DeLima's argument in her surreply, she believes that she

22 doesn't have those terms and would need discovery to try and

23 figure out what they are.  And to me that sort of seems the

24 reverse of how I'm used to seeing contract claims, which is,

25 Here's our agreement, here's what we agreed to, here's what

1    they didn't give me, here's how they breached it, here's what

2    I'm entitled to, and I don't see any of that in the --

3              THE COURT:  There's a sense, I think, of trying to

4    give Ms. DeLima's complaint the broadest reading, that it might

5    be something on the order of like incidental or consequential,

6    you know, that type of damages claim, some type of damages as a

7    result, not so much a right to payment or revenue but some type

8    of depravation of other revenue, but I'm going to let her

9    explain that to me.

10             Let me ask you this, though:  Assuming I found a

11   breach of contract claim here, and I know you say there's not,

12   but assuming I did for the sake of argument, are you making the

13   same argument you made elsewhere, that CDA or First Amendment

14   basically gives you -- is a shield and immunizes you from that

15   type of claim as well, or is that type of argument limited to

16   your other defenses to other claims?

17             MR. MRAZIK:  It would really depend on the specificity

18   of whatever provision Ms. DeLima is relying on.  I think some

19   of the case law in our briefing, for example, if you look at

20   Barnes v. Yahoo!, does have a rather extensive discussion of

21   when there can even be a promissory estoppel claim arising out

22   of some obligation between a service provider and an individual

23   who uses their services, but that has to be a specific and

24   enforceable provision, and it would have to be something that

25   we didn't have discretion to change, and whether and how the

1  CDA interacts with breach of contract is very case specific, so

2  I have a difficult time saying universally that it would

3  foreclose it.  Based on my experience with similar cases, I

4  think it probably would, but it's very difficult for me to say

5  for sure without knowing what exactly was promised, you know,

6  supposedly promised, how specific the promise was, and honestly

7  the idea -- my best guess on your hypothetical is that we would

8  also have CDA immunity, but I can't definitively say without

9  knowing exactly what the claim might be, your Honor, quite

10  candidly.  I'd love to be able to say yes, but that would not

11  be candid if I just said, yeah, CDA immunity across the board.

12            THE COURT:  Well, that's a straight answer.  Okay.

13            What about that contract claim?  If I were to consider

14  transferring that claim, do the YouTube terms of service or

15  Google terms of service impact that right to transfer in any

16  way?

17            MR. MRAZIK:  The terms of service for Twitter and

18  YouTube and for Google, which operates blogspots, all set venue

19  in the Northern District of California for all disputes arising

20  out of the use of or signing up to the service.  So, if the

21  Court sees any potentially viable claim here, then I do think

22  it would fall within the scope of the venue transfer provision,

23  yes.

24            THE COURT:  That's where it's got to go?

25            MR. MRAZIK:  Yes.

1          THE COURT:  All right.  By the way, where are you

2     right now?

3          MR. MRAZIK:  I am above my garage in Seattle,

4     Washington, your Honor.

5          THE COURT:  You're in Washington State?

6          MR. MRAZIK:  Yes.

7          THE COURT:  All right.

8          MR. MRAZIK:  Anything else, your Honor?

9          THE COURT:  No.  I think I'm good for a minute.  I

10    want to make a couple of notes.

11         MR. MRAZIK:  Understood.

12         THE COURT:  All right.  So, Ms. DeLima, I'm going to

13    let you respond now.  The way I understand the defendant's

14    arguments are, basically, it's like three tiers.  The first

15    argument is it's a legal doctrine called *res judicata*, that

16    much of your claim has already been litigated or could have

17    been litigated before, and that, to the extent anything you're

18    alleging now could have been litigated in that case before

19    Judge Barbadoro, that is barred.  Now, they're saying if I

20    disagree with that, and I do disagree with it, by the way, with

21    respect to a few parts of it, at least, they're saying that

22    your complaint doesn't adequately describe, factually allege

23    the causes of action that you have tried to bring here.  And

24    then, third, they're saying if you disagree with that, Judge,

25    the CDA gives us immunity from these claims; we're not allowed

1    to be taken to court for these claims under the Communications

2    Decency Act.  So, I'm going to let you talk about those in

3    whatever order you want.  I'm not going to interfere too much,

4    but I do want to hear you out, so go ahead.

5              MS. DELIMA:  Thank you, your Honor.  Okay.  So, just

6    to establish there is a contract with at least myself on two

7    channels with YouTube.  Now, since we've had our other hearing

8    in the second week of October YouTube has locked me out of

9    Google and locked me out of both channels and deleted a channel

10   for all intents and purposes which is my virtual property.

11   That's number one.  And to get to Twitter and my five accounts

12   they have locked me out of all of those, and those are my

13   virtual property.  So, I had expected safety during the filing

14   of the lawsuit that at least freedom of speech and First

15   Amendment rights would somewhere be on the horizon, and they

16   were not.

17             What we have as a problem is that, when I signed up to

18   be monetized way back, there is and was a contract that 68

19   percent of the earnings would go to me, and they paid them to a

20   teeny little degree, which ended up being about 10 percent of

21   what my channel actually earned, and what they did to not pay

22   me what my channel earned was go into videos and delete views

23   after it was viewed and then subtract all those views so that

24   the money that was earned didn't end up being shown as income.

25   And the reason I wanted to further this and get into discovery

1   is that they have wiped out hundreds of thousands, if not

2   millions, of views on my videos.  They also hide my subscriber

3   account, and they don't have a right to do that.  I disagree

4   with the attorney.  When people choose and opt to -- I'm not

5   making anybody watch me; they do that if they want to see what

6   I'm saying.

7          THE COURT:  Yeah.

8          MS. DELIMA:  And so, what they've done on all the

9   videos is delete and continue to delete the views, and I have

10  people that tell me they wrote a comment and it got wiped out,

11  and I see it happening when I put new videos in.

12         There's a presumption that they can protect themselves

13  by Section 230 and every other form, but they're actually in

14  higher control now than any form of government, because they

15  continue to change their terms of service.  So, when I signed

16  up, it's like selling me a saw, and I get the saw home and I

17  try to go saw the tree down, and then whoever sold it to me

18  says, No, you're not doing that right.  You can't use the saw.

19  (indicating).

20         I also used the most horrendous free speech case on

21  the planet, which I don't like, but to make a display of what

22  it's like, if you don't agree with porn, and I don't, someone

23  can make fun of somebody in that Larry Flint case, and they

24  actually prevailed, even though that insult happened to

25  somebody that had a high reputation.  So, if I was on YouTube,

1    and I'm not making things like that, but if someone doesn't

2    like what I say they can't lock me out of their service and

3    breach our contract that I have and then also steal all the

4    money that it's earning because they don't want to pay me

5    what's actually in our contract.  And this is what happened in

6    the first case, and then it continued on and then after 2018,

7    when the lawsuit was dismissed, they did it even more.  And I

8    get an email when some people subscribe, but they never change

9    it on the platform, so they're actually just trying to not let

10   anybody know the popularity of my channel and the actual amount

11   of earnings, which is a breach of our contract, and what I had

12   wanted to do in that case and in this continued case is fix it.

13   I'm not going to be a millionaire from what I earn there, but I

14   do earn money, and they're keeping it.

15           And then now, since the second week of October they

16   have stolen my virtual property and the rights to it, and I am

17   locked out of Google.  I cannot enter in any of my email

18   addresses, I cannot sign in on anything new, and my first

19   channel, the news channel which I did and I'm not doing

20   anymore, but there's 3,000 or 4,000 videos there that are mine,

21   and they've deleted that entire channel off the internet.  And

22   then for my other channel, which I've saved lives, and, again,

23   you can hate me, you can like me, but for some people that were

24   close to a suicidal position some things I said on there helped

25   them, and it's amazing that they left that channel on and they

1    sent me an email saying, We can monetize it now without your

2    permission, because I had cut off monetization since they were

3    stealing it all, and we can earn it but cut you out of your

4    portion, and that's breach of contract, which is new and what

5    they've been up to for the past 2 1/2 years.

6          Now, when we have the bravery to make a channel and

7    put ourselves out there, it's a very difficult thing because

8    you're targeted and you're exposed and you have people that

9    love and hate you, but when people like myself, *pro se*, try to

10   fix it for the rights of myself and for other people to use it

11   and not be targeted or underpaid or not paid, then we have

12   people trying to not let anything be fixed that their own

13   clients are doing wrong.

14         So, one of the reasons that I'm proceeding and trying

15   to fight not only for myself and my rights, and things they've

16   done to me are brutal, I just want to fix it and solve it and

17   have the rights so that my channels, not just one, but both,

18   earn the money that I signed up for, which is two-thirds, 68

19   percent, of what it earns, and for them to stop tampering with

20   the amount of views on the videos and deleting the comments so

21   they don't reach me so that they can't show that someone

22   watched that and pay me for that view.  And, by the way, you

23   only get a couple of pennies per view.  How you earn

24   monetization from them is in volume of views.  So, the reason

25   they froze my account and the reason they're hiding my

1   subscribers and that I want to get to discovery is that I want

2   what I earned, and it's mine.

3          And we can lie about any kind of protections they

4   have, but they really don't, and when I got to the first case

5   they never let it get to hearings and they never let it get to

6   the discovery which will end up saying to me what is my actual

7   volume.  Because when you're hiding it and when you're stealing

8   it and deleting it I don't know what that is.

9          So, my right should be -- if you're a judge and you

10  get paid per case, for example, and someone lies about how many

11  cases you actually did, it would actually affect your check,

12  because if they say you get $1,000 a case and they delete 25 of

13  your cases, you're only going to get paid for what they're

14  saying that you did.  So, the same theory applies.  If I'm

15  supposed to make money per view on my videos and someone's

16  lying about how many views I have, then we don't have any

17  accurate way to pay me for what is in my contract.

18          THE COURT:  Yeah.  I didn't mean to interrupt.

19          MS. DELIMA:  Okay.  So, what I would presumably like

20  to do -- lawsuits are a fortune.  They're expensive.  This is a

21  nice group of gentlemen here, and what I would like to do is

22  fix it, instead of trying to go to court and, you know,

23  spending all this money on hearings in court and whatever, is

24  just reinstate all of my rights to my virtual property, which

25  are protected.  And the leading case on virtual property

1    rights, I don't know how to say this, it's <u>Hosseinzadeh v</u>.

2    <u>Klein</u>, I did put that in there, and a New York judge ruled for

3    virtual property rights down the board when there was a lawsuit

4    over the earnings and over the right to fair use, and all I'm

5    doing here is having fair use rights to my own virtual

6    property, and YouTube doesn't get to steal it, they don't get

7    to delete it.  The only one that can ever delete my virtual

8    property and my accounts is me.

9          And for Twitter, they're brutal, probably worse than

10   YouTube, because they don't like my free speech, and they don't

11   like my opinions.  I'm very, you know -- I'm pro life, so

12   there's people that are not.  But they can't, and, again,

13   that's why I brought up that drastic Larry Flint case, is that

14   no one liked his free speech, but it was allowed, and for some

15   reason Twitter has taken on the position that they can

16   eliminate and steal accounts in the free speech they don't like

17   and then lie about why you're not allowed to say it.  And so,

18   they have shut my accounts down multiple times, and of the five

19   that there were, because at the beginning Twitter let you have

20   as many as you wanted -- and, again, my virtual property is

21   there whether they're letting me have access to it or not, and

22   I had wanted a political account and a personal account in

23   which I didn't do anything to do with politics, and it ended up

24   being that they kept locking me out of one so that I had put

25   politics in the one that I didn't want anything in there, I

1   wanted to just socialize.  And then they've kept me out of all

2   of them, except for two, after 2018.  And then in 2020 they've

3   shut me out of all of them, and they don't even have a legal

4   reason.  So, now they've just suspended the accounts without

5   even allowing for my free speech.

6          And, by the way, there are people on there that say

7   horrific, awful things.  When I had to delete a tweet, you

8   know, a made-up excuse why, all I did is say something that

9   Acosta, Jim Acosta as a reporter is a horrible reporter, and it

10  wasn't anything that was -- I don't have the kind of language

11  where I threaten people, threaten to kill people, wish people

12  are dead, because I don't.  I also put things out there that

13  might make someone have a better attitude and whatever, because

14  it was his tweet that was really upsetting, and I responded to

15  it.  So, there is a bias to allow someone like him to slam

16  other people and say horrible things, but if you respond and

17  say, you know, Grow up, you're going to get suspended?  It

18  doesn't work that way.  And, again, that's why I brought up

19  that drastic case.

20         What we all have to do is share the internet, and if

21  YouTube doesn't want certain things they can -- some things are

22  grandfathered in, like what they did with my channel.  Those

23  are my two channels, and I didn't ever even want two channels.

24  I had to create one when in the other lawsuit they locked me

25  out of my original one.  So, all these accounts were a

1    consequence to what they were doing by prohibiting my right to

2    access under a contract that I should be paid.

3            THE COURT:  All right.  Let me ask a couple of

4    questions, then.  You started out talking about, I certainly do

5    have a contract.  In your simplest terms possible what is your

6    understanding of what your contracts are between these

7    different defendants?

8            MS. DELIMA:  So, the contract between YouTube and

9    Google was a monetary one, and it was --

10           THE COURT:  Between you, YouTube and Google, right?

11           MS. DELIMA:  Correct.

12           THE COURT:  Okay.

13           MS. DELIMA:  And I had to put my initials and

14   permission in to have that.  So, that contract was that my

15   videos would be monetized and I would be paid per view and they

16   would be paid per view, and I would get 68 percent of the views

17   and earnings that would go, and the most they ever gave me per

18   month was about $1,500 a month, and then the next month they

19   would cut it down to like 600, and not only does the internet

20   not go that way, earnings don't either.  It was something where

21   YouTube was, that's how I found out they were underpaying and

22   deleting and stealing the views to not pay the same thing, and

23   we all have a right to those earnings.

24           Now, initially, back in I want to say 2014 and 2015

25   channels were earning between 25- and 30,000 a month from

1    YouTube, and they started to get greedy, and they cut that down

2    on everybody, and they cut other people's views as well, not

3    just mine, and they cut their earnings down to 1,000 and 1,500

4    and started keeping the rest.  So, it's absolutely not

5    exclusive to me.

6          THE COURT:  What about Twitter?

7          MS. DELIMA:  So, Twitter, the way Twitter hurts you is

8    that if I want to sell something --

9          THE COURT:  No.  But wait.  No.  My question:  What's

10   your contract with Twitter?

11         MS. DELIMA:  Oh, the contract with Twitter is just

12   that you have virtual property rights on the account that you

13   create.  You go in, and you have to create an account, and they

14   give you a specific IP address and name and whatever, and that

15   is your virtual property.

16         THE COURT:  Okay.  Now, you've told me -- you sort of

17   anticipated my next question.  You told me how you believe

18   Google and YouTube have breached your agreement.  Tell me how

19   you think Twitter has breached your agreement.

20         MS. DELIMA:  By shutting down my access to my own

21   virtual property all the time and for no real reason and to

22   sever my -- it's discrimination, and it's to sever my rights of

23   free speech and my communication and also my right, because I'm

24   a business owner, to put my business listings or access to me

25   on a tweet so that people could find me or purchase anything I

1    had.  So, it's affecting that way my right to live.  It's big.

2            THE COURT:  Yup, yup.  Okay.

3            MS. DELIMA:  And just as a sidebar, which shouldn't

4    matter, although it does matter, I'm done with politics.  I

5    tried everything, and while I no longer wish to pursue that or

6    make any comments on it, I have a right to access to

7    everything, because it's my virtual property and because I have

8    a right now to get back on there and do anything else that I

9    want, and if I did choose politics again and for the future, I

10   still have that right.  I just am telling you on a personal

11   level I'm all finished with politics.

12           THE COURT:  Yeah.  All right.  Is that because of the

13   experience you've had with these defendants, I guess, for lack

14   of a better word, as you would say, on de-platforming you?

15           MS. DELIMA:  It's that and it's very painful to see

16   the bad things that are corrupt and that are out there.  You

17   can only awaken people so much, and then the rest is up to

18   everybody else to decide what to do.  For me, because I'm

19   targeted and blackmailed and blacklisted, I'm 61 years old, I'm

20   done.

21           THE COURT:  Yeah.

22           MS. DELIMA:  I'm just burnt.  And so, I think I

23   made -- I'm starting to cry -- I think I made a difference with

24   what I did, but I'm tired of being lied about to try to help.

25           THE COURT:  Understood.  Okay.

1           Mr. Mrazik, I guess I could use a little tutorial, and

2    this can be Mr. Eck, too.  It doesn't matter who.

3           And, by the way, Ms. DeLima, you're going to get to

4    say more, if you want to.  Don't worry.

5           These YouTube monetization policies, I took a look at

6    them online, I'm just trying to find out how they really work,

7    you know.  How does one get paid for having a YouTube channel

8    or to blog on the blogger service?  How does it work, if you

9    know?

10          MR. MRAZIK:  I honestly don't know, your Honor.  I

11   would be really speculating and just relying on the same public

12   terms that you have.  I don't know.

13          THE COURT:  That's fair.

14          MS. DELIMA:  I can answer, if you would like.

15          THE COURT:  Sure.  Yeah, go ahead.

16          MS. DELIMA:  When we started it was in print, and they

17   sent it to us, and it was in terms that we could go connect to

18   on our YouTube.  We could also go in and see what they were

19   doing and how they were paying us and how much we were getting,

20   and over time that's part of what they hid, and then they

21   started doing the "We're not going to pay you" thing.

22          My channel, I don't know how big it is.  I know that

23   in the movement that I was in, which was loving the flag and

24   the country, there were 80 million people in it.  Is everybody

25   on YouTube?  Did everybody find me?  I doubt it, but a lot of

1    people did.  When I actually appeared at some places in New

2    Hampshire people knew me by YouTube that had never met me, and

3    when I walked down the hallways they would just be like, "Hi,

4    Natasha."  So, I'm not from New Hampshire.  I spent 50 years in

5    Massachusetts.  I don't know anybody.  So, how big is your

6    audience when you're recognized by YouTube?  I don't know.

7         THE COURT:  Yeah.

8         MS. DELIMA:  One of the things, if I walked down the

9    street and someone recognizes me in a place I've never been

10   before, you have to say to yourself how big was my audience?

11   And there were so many people that had access to reach me in

12   different areas that would say, I wrote to you, I watched your

13   video, you saved my life, whatever, and, once again, to not pay

14   me and to not make me look popular or worthy you have Google,

15   YouTube erasing and freezing me to make me harder to find.

16        The other thing that their CEO said was that they

17   pulled our types of videos out of searches and hid us on

18   Google.  It used to be that when we uploaded a video it ended

19   up on the Google browser, and so anything that we said, and if

20   I said something about, you know, apples, you'd go into

21   "apples" on Google, and my video would show up.  Because they

22   didn't want us to have fame and to have my type of narrative be

23   out there they ended up putting in an algorithm that hid my

24   videos and hid the content, and you had to find me another way,

25   and people still did.  And, again, I just went to rallies in

1 | 2020 and walked around New Hampshire and to the State capital

2 | and had people say, "Hi, Natasha."

3 |       THE COURT:  Yeah.

4 |       MS. DELIMA:  And, again, I have a whole bunch of

5 | enemies, and, you know, they're entitled to not like me.

6 | There's nobody in the world that has everybody like them, and I

7 | wasn't trying to be popular.  I'm just who I am, and some

8 | people like me, some people don't, but I've been on YouTube

9 | videos where I don't like what they say, and I just get off the

10 | video.  They have a right to that, and there are people that

11 | want to hear what they're saying, and nobody's censoring that

12 | type of video that I don't like.  So, we have to share.  And

13 | they can't run a company as a public place and just eliminate

14 | people and steal their virtual property or the money it makes

15 | because they don't want it to make money on someone else's

16 | thought process.  That's what makes us all different.  I'm sure

17 | each one of us here in this room has a different view on the

18 | same exact thing, and that's what it's supposed to be like.

19 |       THE COURT:  Okay.

20 |       MS. DELIMA:  And honestly, your Honor, if I have to

21 | amend things to make it, you know, current, I can do that.  I

22 | just would really like to make this be the last lawsuit we file

23 | and we fix it.

24 |       THE COURT:  Yeah.  The thing is I appreciate your

25 | point.  You're basically trying to say to me, Look, I don't

1   want to be in court litigating; I'd like to meet with these

2   gentlemen who represent these defendants and work this out.

3   The problem is the way you want to work it out is basically to

4   have these defendants reverse the decisions they've made about

5   you, and they stand by the decisions they've made about you.

6   Like, they don't want to reverse it.  So, the question becomes

7   can you prove that they have harmed you in a way that violates

8   the law, right?  I mean, that's why you're in court.  If they

9   wanted to give you what you want you wouldn't have to go to

10  court.  Unfortunately, I think you're stuck with court.  I

11  could order these guys and say, Look, sit down with Ms. DeLima

12  and work it out, but there's limits on what they can do based

13  on what their clients allow.

14           MS. DELIMA:  Right.  Well, I have a lot of screen

15  shots of the deleted comments of people saying their comments

16  were written and deleted.  I mean, I have over probably 500,000

17  pieces of evidence during these years of what people have told

18  me, things they've written have been deleted, views that have

19  been counted, subscriptions that aren't hidden, but in order

20  for me to have all that, imagine how much there actually is.

21  And so, the reason I needed to proceed is to actually say,

22  Google, show me who's going into my account, show me what

23  you've done here.  Because what they did is, say a video had

24  50,000 views.  They won't let it go past that, even though

25  other people just say, "I just watched your video," but the

1    count does not go up anymore.  So, they've frozen it so that,

2    again, the way they do things at Google and YouTube is they

3    hide things by search results and video popularity.  So, if

4    they go in and eliminate everything, your videos just become

5    hidden, and the only way people can find them is by actually

6    going on your channel and doing a search.  And so, they've done

7    a lot of manipulating to hurt themselves and to hurt speech

8    they don't like.

9         So, you said I didn't have to prove the evidence.  I

10   have evidence from screen shots and people and their statements

11   and their emails and things like that.

12        THE COURT:  Oh, yeah, I get that.  All I meant to say

13   was that you don't need evidence for this hearing today.

14        MS. DELIMA:  Right.  Gotcha.

15        THE COURT:  If your lawsuit survives and goes forward,

16   eventually you would have to present that evidence.  That's

17   just the way it works.

18        MS. DELIMA:  Right.  Okay.

19        THE COURT:  Okay.  I think I've got what I need.

20        Mr. Mrazik, is there anything you want me to know to

21   evaluate your arguments?  I'm happy to listen.

22        MR. MRAZIK:  I think I'll make just two brief points.

23   To the extent that this breach of contract claim is something

24   that goes back, way back, it's something we could have

25   litigated last time around.  I was looking back, I was trying

1   to remember if in our prior motion to dismiss, I believe we had

2   raised the breach of contract issue and said.  If there is a

3   contract here you've got to plead it, and it wasn't pled.  I'm

4   not sure what contract it is that Ms. DeLima is referring to.

5          Second, I think we've set out in our briefing cases

6   that have addressed each of the issues that Ms. DeLima is

7   concerned about under CDA immunity, and the decisions are

8   publisher conduct.  Whether to leave accounts up or take them

9   down, whether to take down a particular piece of content or how

10  you design your service are all publisher conduct as well as

11  whether or not to allow ads to run alongside certain content or

12  to feature ads or to not feature ads.  The various cases that

13  we cite in our briefing, Force v. Facebook, the Lycos case from

14  the First Circuit, Goddard v. Google and Klayman v.  Zuckerberg

15  all address those issues.

16         And I realize that Ms. DeLima may be frustrated with

17  the outcome.  You know, anybody who reads the news today

18  understands the feelings that Ms. DeLima is having about

19  frustration with the terms of that law, but it remains that

20  that law does confer and immunize the conduct that is put at

21  issue here.

22         Unless you have anything further, your Honor, I can

23  stop there.

24         THE COURT:  I will give you the last word, Ms. DeLima.

25         MS. DELIMA:  Well, regarding the first breach of

1   contract, the Court had it said that no matter what I was doing

2   in that claim they were not applying the law or listening to me

3   or allowing for the case to go forward.  That's just how that

4   was.  But as far as the breach, it's a different breach than we

5   had in the first case.  It's further breach, it's additional

6   breach.  In other words, in the first case at least my channels

7   were up and they were paying me something, and one thing we can

8   learn from the change is, once they froze it and were stealing

9   all the money that my channel was earning, they forced me to

10  just cut off the monetization, which cut off my own earnings

11  and my income.  So, basically, if you consider the first case

12  was the original breach, this case now is about stealing all my

13  revenue from further breach and preventing me from their own

14  terms, because they weren't giving it to me, they were keeping

15  it for themselves.  So, you might want to call it "breach," but

16  it's really theft of contract.  It's not the same thing.  You

17  want to categorize it that I've done the same thing in both

18  cases.  I didn't.  And the first case should have been heard.

19  But just like I went -- I filed a case here about anti masks,

20  and the laws, because there's no legislation on the books for

21  masks, they also would not let that case go through.  I ended

22  up having to withdraw it because they wouldn't put it through.

23          THE COURT:  But here's what you have to understand

24  about court:  You're not going to like this part, okay, but

25  it's a fact that I could never change.  When you say the first

1    lawsuit should have been allowed to go through, you might be

2    wrong, you might be right, for all I know, but the fact is

3    there's not a thing in the world I can do about that.

4            MS. DELIMA:  Of course.  I get that.

5            THE COURT:  Any part of your case, and I've gone

6    through it carefully, anything that's part of your case that

7    either was part of that first case --

8            MS. DELIMA:  Right.

9            THE COURT:  -- or could have been --

10           MS. DELIMA:  Right.

11           THE COURT:  -- I need to tell you now, I'm not going

12   to bait and switch you, that's going to be out, it's gone.

13   It's just the law.  Because if I let it go through, these

14   gentlemen would have to do their job and tell the Court of

15   Appeals that, Well, Judge Laplante ignored your prior order and

16   allowed her to relitigate something that you already decided,

17   and they would just shut it down, as is their duty.

18           MS. DELIMA:  Right.

19           THE COURT:  The question for me is whether those 2018

20   to the present YouTube issues and the related ones that

21   Mr. Mrazik mentioned a few minutes ago and you did, too --

22           MS. DELIMA:  Right.

23           THE COURT:  -- is whether those allege a valid cause

24   of action, and, if they do, does the CDA, the Communications

25   Decency Act, provide a shield for these defendants to deflect

1    that lawsuit.

2              MS. DELIMA:  It actually doesn't.

3              THE COURT:  Believe me, I know your argument.  I get

4    it.  Okay.

5              All right, folks.  Thank you.

6              Nick, is there anything you wanted to ask, anything

7    you want me to cover that I haven't covered here today?

8              MR. CASOLARO:  No.

9              THE COURT:  All right.  Ms. DeLima, Nick is a lawyer

10   who works with me.  He works with me on these cases.

11             Okay.  Thanks, everybody.  I'm going to get -- I'm

12   pretty close to figuring this out, I think.  I'll get an order

13   out here shortly, and you'll be able to proceed with whatever

14   you want to do next.  All right?

15             MS. DELIMA:  Oh, thank you so much.

16             THE COURT:  I hope everybody is healthy and don't have

17   any COVID issues.  Take care.

18             MR. MRAZIK:  Thank you, your Honor.

19             MR. ECK:  Thank you.

20             MS. DELIMA:  Thank you.

21        (WHEREUPON, the proceedings adjourned at 3:00 p.m.)

22

23

24

25

```
 1                      C E R T I F I C A T E

 2

 3

 4          I, Brenda K. Hancock, RMR, CRR and Official Court

 5  Reporter of the United States District Court, do hereby certify

 6  that the foregoing transcript constitutes, to the best of my

 7  skill and ability, a true and accurate transcription of the

 8  within proceedings.

 9

10

11

12

13  Date: ___4/23/21          /s/ Brenda K. Hancock
                              Brenda K. Hancock, RMR, CRR
14                            Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```